Administrator, U.S. Small Business Administration. Mr. Light, for the appellant. Mr. Interante, for the appellee. May it please the Court, my name is Charles Light, and I am the appellant in the matter now pending before the Court. I would like to make a few points. I hope I've adequately  positioned in my briefs, which are voluminous by this time, but I would like to make a point about the assertions that my sworn testimony is somehow conclusory, speculative, and self-serving. I am the only person in this litigation who can actually testify as a precipient witness to the events which occurred in 1994 and to the events which occurred to me in 2004. The facts which I set forth in my declaration are facts known to me personally by my own observation, and no supervisor of mine, despite having been cited by the SBA and by the District Court, observed any of the events which occurred between August 30th of 1994 and September 2nd of 1994, and they have so testified in their depositions, and that testimony is included in the brief below as well as in the brief here. The SBA has offered no evidence from any employee of the SBA who was present on the days between August 30th and September 2nd of 1994. There is no testimony other than mine. Are you talking about on the question of the reasons why you weren't rehired or retained at that point? Is that what you're talking about? That's correct, and the next point I would like to make is that the sole reason that the decision was made to terminate my employment or to end my last 60-day temporary appointment, the sole reason was what occurred on the morning of September 1st of 1994. This evidence is testified to by my intermediate-level supervisor, Mr. Appelt, when he was asked in his deposition, would you talk about disruptive? Are you speaking of the events which occurred on September 1st, and his response was yes, and that's all. In addition to the extent that it would be admissible, the submissions to the district court in the Eastern District of California contained admissions by the SBA that there were two reasons that the SBA had for deciding to terminate my appointment. One was downsizing, and the other was the events which occurred on September 1st of 1994, and Judge Dan Rell acknowledges this, and that's also pointed out in my brief. So, assuming that that is correct, how does that help you? Well, because nobody knew, including the responsible official in 2004, what actually happened on September 1st of 1994, and I'm the only one who can offer evidence as to that, and I was not disruptive, and the sole involvement that I had on the morning of September 1st of 1994 was to answer a question of a colleague. I answered that question, I was silent for the remainder of the day, and other people in the office went out and told my supervisor, Mr. Rewers, may he rest in peace, that I had been disruptive and confrontational in the office that morning. There is no truth to that. But can we just suppose you behaved entirely properly, and then fellow workers falsely and maliciously told their superiors that you had not, that you had behaved badly, and I assume they put that in very extreme terms, and persuaded the superiors that you had behaved badly. Then, about 20 years later, the question of hiring comes up again, and the person who is responsible talks to people who, other than you, who were involved in that episode, and they tell him these things which I will assume are complete lies, complete lies. Does that show either retaliation or, well, retaliation, that's what we have before us. Your question, Judge Williams, is an excellent question, and it would go under normal circumstances to whether or not the responsible official in 2004 had an honest and reasonable belief that I had engaged in conduct which barred me in perpetuity from employment by the Small Business Administration. The problem with that, and the significant difference between this case and Brady, is that in this case there was no investigation ever. Well, why does, if we take the, what's it called, blue card? Is that what it's called? Blue card? Yes. If we take that, the blue card, which is at A241, which says, during employment in A4, the employee demonstrated conduct issues concerning his inability to get along with his co-workers and managers. Why isn't that a legitimate reason for not rehiring you now? Because Mr. Hoberman himself testified that if it were not for my letter of September the 14th of 1994, my notice of constructive discharge to the agency and my supervisors, if it were not for that letter, and all that he had was the blue card, he probably wouldn't have had this matter before him. Mr. Hoberman testified, and his testimony is set forth in the brief below and in the briefs before this Court. So the difference with regard to the blue card, aside from the fact that there is no evidence, and there can be no evidence, that the comment in the blue card was actually included in the blue card when it was created, calls into question whether or not there's any truth to that statement. To which statement? That I had conduct issues related to my ability to get along. No, but what about Hoberman? Are you calling into question a statement of his? In other words, I started with this hypothesis that you were the victim of a whole bunch of lies in 1994, but then we have an agency which is, 20 years later, has an issue as to which those events of 1994 are relevant. Mr. Hoberman testified that there were three pieces of evidence, three sources of knowledge which he obtained and upon which he based his decision to not hire me. And putting aside for the moment whether or not the blue card was a fabrication, and I believe that there is sufficient evidence at least to get to the jury on that question, but putting aside the question of whether or not there was a fabrication of that blue card, Mr. Hoberman's testimony is that if it wasn't for my notice of constructive discharge, he may never have gotten to the blue card issue. Well, your letter said various. Let's assume the letter was pivotal. I think the record is complicated on that. Let's assume it was pivotal. But the record, the letter has a number of items in it, one of which in his testimony he said was decisive. And is there anything that contradicts that? I mean, decision makers can often get information from a source which contains information that doesn't interest them, is irrelevant, whatever. It depends, Your Honor, on whether or not the SBA can call my notice of constructive discharge of an EEO counselor, whether he can simply parse that letter and select out things he doesn't like, and then say, I didn't consider anything having to do with the EEO protected communication, I just selected a few sentences out. And those few sentences I found to be not constructive and untrue, and therefore an indication of the reason why you cannot work within the disaster framework, disaster program framework. I'm just trying to get the principle here. If a decision maker is confronted simultaneously in the same document, in a single page, with information that he would be perfectly okay to consider, and information that he should not consider at all, and he says he relied on the information that he was properly considered, the plaintiff automatically gets to the jury. I'm going to assuming that the other information in the document would have been retaliatory to rely on. Right. If I can, I'd like to quote from page 22 of my brief below at A188. And I'm quoting from the decision in Petway v. American Cast Iron Pipe Company. The court, the Fifth Circuit, five years after the passage of the Civil Rights Act, addressed the question of whether or not a letter was entitled to protective conduct and what employers could do in the face of that kind of letter. And Petway says, we hold that we're disregarding the malicious material contained in a charge or other communication with EEOC sufficient for EEOC purposes. The charge otherwise satisfies the liberal requirements of a charge. The charging party is exercising a protected right under the act. He may not be discharged for such writing. Let me give you an example. I'm just wondering whether that particular sentence can be taken seriously. Suppose that this letter, which itself is protected, has five pages that are, to use an extreme term, raving. The person raves maniacally for five pages. I've been accused of that. What? I've been accused of that at times. Well, whatever. Let's just assume that. And then has some argument which is pertinent to the complaint that occupies one sentence. You're saying that a decision maker confronted with a request for employment from the author of this letter cannot look at those first five pages. I'm saying that if the I'm saying that if it can be determined that the communication is a protected communication under Title VII, that it cannot form the basis of an adverse action. And there are a number of cases in this circuit, including Singletary v. District of Columbia, Foreman v. Small, the Petway case out of the Fifth Circuit, and others in this circuit which are cited in my brief below. Did any of them involve a situation like the hypothetical that I put? I beg your pardon? Did any of them involve a set of facts like the hypothetical that I put? It's very interesting. The Borgo case, Borgo v. Golden, decided here, the panel reversed a grant of summary judgment to the plaintiff on the grounds that a single paragraph in a two- or three-page letter could be construed as a claim of discrimination. That letter was not written within the penumbra of a Title VII action. But we didn't hold that they couldn't rely on the letter at all. No, you held that that question was a question for the jury. Yes, with respect to the context of that letter. Right. But the broader argument that you're making now, which is that you can't rely on a letter that contains any objection at all, we certainly didn't say it. We said the opposite in Borgo. I'm saying at the summary judgment level, the letter, if it contains conflicting inferences, it is proper to let that letter go to the jury and allow the jury to determine which inference will be granted, especially given the fact that the non-moving parties should get the benefit of every inference. That's the Hornbook law. And here, the district court not only did not give me the benefit of any inferences, it actually resolved all conflicting inferences in favor of the Small Business Administration. Are there further questions from the panel? Well, we used up your time. We'll give you some time for rebuttal. Thank you very much, Your Honor. May it please the Court, Mr. Light, John Interante for the Administrator of the Small Business Administration. This Court should affirm the district court's granted summary judgment in favor of the agency in this case. The SBA articulated a legitimate, non-retaliatory reason for not hiring Mr. Light for an attorney position in the Office of Disaster Assistance in Atlanta in 2004. And the reason, which is clearly stated on the record, was that Mr. Light had demonstrated conduct issues during his prior temporary employment with the same office in a different location in 1994. Or his disruptive behavior was inappropriate to the specific nature of disaster relief or disaster assistance. It's a stressful work environment. Conduct issues can be disruptive. No reasonable jury could infer retaliation from the evidence on this record. Mr. Light has not pointed to any evidence of retaliation. Here today, in the briefing and below, he's failed to produce sufficient evidence of either retaliatory animus by the decision maker, Mr. Holberman, or that the proffered reason was pretextual. And I'll highlight four points that demonstrate this. First of all, there is no causal link here between the 2004 hiring decision and Mr. Light's most recent protected activity, which was arguably the decision in January of 2001 by the Eastern District of California granting summary judgment for the SBA in the underlying discrimination case. That's three and a half years gap. Well, assume for the moment that we accept Mr. Light's argument that there could be a special case where it's the first opportunity. Okay. Then what do you have? Well, we would first argue that the first opportunity to retaliate should not be adopted by the circuit. To the extent that there is some authority outside of the circuit for that proposition, it is in the context of a prima facie case. And causation can be met by arguing that the time frame should be told or collapsed because of a gap of employment. But if it's part of the prima facie case, we have said in ACCA and almost every case we've had, that any evidence that makes up the prima facie case can also be used for summary judgment. It may not be enough. I figure your argument is that it's not enough. But we've never said quite the opposite. We've said that you can consider it. The Court must consider it, in fact. That's correct, Your Honor. But the difference, of course, being that between the prima facie case and this Court's precedent in Brady and Jones and other cases, is that the government has come forward with a legitimate non-retaliatory, non-discriminatory reason. And the burden has then shifted to the plaintiff to show by a preponderance of evidence that there's pretext, the reason is unworthy of credence. And therefore, the causation argument collapses into the broader inquiry into causation or evidence of pretext or other evidence by the plaintiff. And the burden is going to be higher in that instance. And mere evidence of temporal proximity, even if the Court were to accept Mr. Light's argument, is extremely weak. I believe Judge Lambert, the district court below, referred to it as anemic. There is no additional evidence, as this Court has indicated in Woodruff, that there has to be some positive evidence beyond mere proximity to defeat the presumption that the employer or the agency now has because we've articulated a legitimate non-discriminatory reason, presumption that our explanation is genuine. Mr. Light really has nothing other than this first opportunity to retaliate. So again, our argument is three and a half years is too long. Well, the other argument is that the decision-maker looked at a document which made reference to EEO complaints. Correct. And first, it's a historical document because the activity, protected activity, had ceased in 2001 when Mr. Light's lawsuit was dismissed or the summary judgment was granted. And it's happenstance in this case that the decision-maker actually came into contact with the letter. The evidence is that because Mr. Light was a prior employee, that when he applied for employment again with the same office in the SBA, that a check was done of the blue card system. It was an electronic database at that time. There was the negative comment in the record. And that escalated it to Mr. Hoberman, who's the director of personnel for this section. That's the only reason that Mr. Hoberman became aware of Mr. Light's application. And it was through the conduct, negative conduct, comment already in the record. And what Mr. Hoberman did is he contacted the field office in Sacramento. And when he did that, they actually had the original blue card. And they had a copy of what the SBA has always considered a resignation letter. And so on the blue card record that Mr. Hoberman had access to, it has resignation as the reason why Mr. Light left. And he called to check on that. And the field office, Evelyn Morris, had a copy of the original letter. I don't know if it's original or a copy. And she forwarded it to Mr. Hoberman. And so when he read the letter, which did indicate that Mr. Light had complained of discrimination, but Mr. Hoberman also was aware that there was a prior lawsuit, so he was aware of that protected activity. What stood out to him was the comment about Mr. Light leaving angry and his disparaging remarks about his prior supervisors in the office. And that is the language that Mr. Hoberman seized upon. Language consistent with the negative comment already in Mr. Light's blue card system. And the third point is Mr. Hoberman, when Mr. Light's name came to his attention, actually recalled that in 94 he had reports from the supervisors, Mr. Light's supervisors, that Mr. Light had been disrupted. So there were multiple bases, all consistent with the decision and our legitimate non-retaliatory reason for not hiring Mr. Light. You said they had turned up the original blue card. Is the blue card at page 602 of the joint appendix the original or is that a later version? The system of records that's implicated originates with a card that is developed in the field office. Mr. Light worked in Sacramento. So the card that has the inability to get along with others is the card that was actually in the district and it just happens that they had maintained a copy of that in a notebook along with the letter. The database is generated through a card that is sent from the field to the central records. This one on A602, which I think is also A241. Yes. This is the hard copy card that was in the district, not the electronic one? That's my question. A602 is a printout from the database and the date on it, November 9th of 2004, was the date it was printed. Did Mr. Holberman print this out? It was printed out in response to the EEO investigation that followed Mr. Light's complaint. So I'm not – this is not what Mr. Holberman printed out. What he testified to is that he – Is this what he saw? He saw this information, yes. He wouldn't have seen this particular – This was in the database? Correct. And it was in the database in 2004. The other card was in the field office and the information is slightly different, but the field office just happened to have retained a copy of it. What's the difference between the one on 241-3 and the one on 602? But those are the same. They're the same, and actually the date of 9-12-2012, there was a declaration submitted explaining – Oh, I see different dates. And it was Ms. Cooper? It was the date – In the declaration, the witness clarified that she printed out this version of the record from the database on September 12th, 2012. That was during discovery, and if you compare the two, the only difference is that there's a different date of the printout. The information is identical. The record hadn't changed. Okay. And Mr. Holberman's testimony was that it's the same information it was in when he was provided access to that information two months earlier in 2004. Are there questions from the Court? Is that out of time? No. Okay. If there are no further questions, the government submits. Mr. Leite, you are out of time, but as I said, I'd be happy to have another two minutes. Thank you, Your Honor. The blue card at A602 is the blue card record that was submitted to the EEO investigator in, I believe, October or November of 2005 is when I saw it in the report of investigation. That's the first that I saw – that's the first that I saw any government record from their Privacy Act System of Records database that had any reference to me. Mr. Interanti indicated that the original blue card had been retained in Sacramento. That is not actually true. At A282 and, again, at A284, you'll see photocopies that were obtained from Sacramento of a photocopy of the original blue card. And it is that photocopy, each one of them, that prompted me to question whether or not the language, which appears at the bottom of A282 and the bottom of A284, which says conduct, inability to get along with others, was included in the original blue card. And that's why I created the exhibit, which you will find at A285 through A291. And that exhibit was prepared so that the court could see for itself how the language would have appeared with a completely white background, while the card itself appears with a darker contrast because of the – yes? What about the A602, A241? Do you have an argument that that's also – The only difference between those two is the date that they were printed out. No, no, I know, but I'm – as compared to the one at 282, just for a moment, just looking at the 241 one, is there something about that one that you think is also fraudulent? The one at – A282? No, the one at 241 or at 602. The only thing that is fraudulent about those is the language with regard to conduct. If the language with regard to conduct, which appears on A282, was added after the fact – I see. You don't think that the stuff in the database was added after the fact? I do, in fact. No, I mean – I'm sorry. You think it came from – at the time that – I'm sorry. I'm trying to get this exactly straight. At the time that Hoberman looked in the database and saw either 602 or 241, is your argument that he saw something different than we're looking at for 602 or 241 also? I will – I'll go even further than that. Yeah. There is no evidence before the court. There is no evidence in the record which establishes that Mr. Hoberman ever saw any document out of the database until after the decision was made to reject my application for employment. He testified that he saw the blue card and that – No. No, he testified that the information on the blue card was relayed to him by his staff. And he – and there is no testimony from Mr. Hoberman in this record. There is no statement from Mr. Hoberman in this record that he actually saw a blue card record at any time prior to making the decision and when he made this decision is also a question of fact because my original application was received by the SBA on August the 18th, and he claims he didn't make a decision until I faxed a new application on the 14th of September. So – but there's no evidence in the record, and I swear to almighty God, there's no evidence in the record that Mr. Hoberman ever saw documentary evidence with that language on it until after he made his decision to reject my application. But he was told, you're saying. He says – he says that he was. Yeah. But he doesn't know who told him. There's no way to trace – the SBA has made it impossible thus far to trace how he learned it. He doesn't even say who told him. He doesn't say when he was told. He said when the information came available to me that this was in there. But he doesn't put a date on it. And I'll refer you to his affidavit, and you can look for yourself in his affidavit because that's what the government cites as the evidence that he saw it. But if you read his affidavit, he simply says he was told by somebody. And it doesn't say when he was told, and it doesn't say how he was told. It doesn't say who communicated it to him. None of that information is made available. But what I consider to be most important with regard to these blue cards is that the two people who had the ability and the authority to enter negative comments on the blue card, area council and deputy area council, both denied under oath that they had anything to do with the inclusion of that language on the blue card and that they were the only people who could have included it. And it would have had to have been included according to Mr. Halberman's own testimony. It would have had to have been included when the blue card was created. And yet when the blue card was created sometime around October of 1994, as best as I can determine, both Mr. Appelt, deputy area council, and Mr. Moser, area council, both deny under oath that they had anything to do with the inclusion of that language in the blue card. And that, I would submit, is evidence that the language was not in the blue card when it was created and was added after the fact. And if it was added after the fact, it could have been added in 1999 while I was right in the middle of my EEO action so that in case I ever applied for a job again, they would have that. Or more likely, it was added after the decision was made to terminate me when they realized that if the termination was based, as Mr. Halberman said, on my constructive discharge letter, Mr. Halberman's letter of October the 6th says it was this letter, my constructive discharge notice, this letter which gives us an indication of your inability to work within the Disaster Area 4 framework, this letter, this protected document. And so if he writes a letter on October the 6th that identifies a protected Title VII communication as the reason why he decided not to hire me, that's retaliation. That's a direct evidence of an admission of retaliatory animus. And so I would submit that this language, conduct, inability to get along with others, which is somehow translated from the blue card at A-282 and A-284 into entirely different language in A-602 that Well, conduct, inability to get along with others. The original says, after reason for leaving, resignation, hyphen, sexual harassment complaints. The words sexual harassment complaints, Your Honor, do not appear in A-602. They're not there. The language conduct is much more extensive. Is that helpful to you or hurtful to you? What it does in my view, Your Honor, is it creates a question of fact about how these documents were created and whether or not they were created in order to demonstrate as best they could that there was other documentary evidence outside of that Title VII protected document upon which they could rely. If that language was not in the system until, and we know that the earliest evidence that we have of that language in the system, language different but similar in the system, the earliest evidence that we have that it was in the system is on November the 9th. That's A-602. So if that's the earliest, then we have no evidence that that information, that language was in the database or on this card that came from Disaster Area 4 at A-282. We have no evidence that that language existed prior to the time that the EEO investigation had begun and they needed documentation to submit to the EEO investigation. Are there further questions from the panel? We'll take a matter under submission. Thank you, Your Honor.